UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MICHELLE MARKEY-SHANKS,

        Plaintiff,

v.                                  Case No. 1:12-CV-342

METROPOLITAN LIFE INSURANCE        HON. GORDON J. QUIST
COMPANY and the TRW AUTOMOTIVE
WELFARE BENEFIT PLAN,

        Defendants.
_____/

## OPINION

Plaintiff, Michelle Markey-Shanks, has sued Defendants, Metropolitan Life Insurance Company (Met Life) and the TRW Automotive Welfare Benefit Plan (Plan),[1] under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, seeking review of Met Life's June 29, 2011 final decision denying her long-term disability benefits beyond December 13, 2010.  Pursuant to the ERISA Case Management Order entered on June 6, 2012 (dkt. # 8), Defendants have filed the Administrative Record and the parties have filed cross motions for judgment on the Administrative Record in accordance with the procedures set forth in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998).  For the reasons set forth below, the Court will grant Defendants' motion, deny Markey-Shanks's motion, and affirm Met Life's determination that Markey-Shanks is not entitled to long-term disability benefits.

---

[1]The proper TRW Defendant appears to be the TRW Disability Income Insurance Long Term Benefits Plan, rather than the TRW Automotive Welfare Benefit Plan.

# I. BACKGROUND

Markey-Shanks was employed by TRW as a Senior Desk Top Analyst from July 3, 2000 through January 23, 2009, when she ceased working due to asthma.  Markey-Shanks's Desk Top Analyst position was classified as a medium physical-exertion-level job, requiring her to, among other things, analyze computer systems and user needs, act as a troubleshooter, install computer hardware and other components, and verify correct operation of software packages.  (Page ID 647.)[2]

As a TRW employee, Markey-Shanks was a participant in the Plan, which provided short-term disability benefits (STD) for six months, (Page ID 35–46),  and long-term disability benefits (LTD) thereafter.  TRW self-funded STD benefits and provided LTD benefits through a group disability insurance policy (Policy) issued by Met life.  (Page ID 180–226.)  Met Life administered claims for both STD and LTD benefits.  The Policy contains the following two-tiered definition of disability for purposes of LTD benefits:

> **Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental injury:
>
> •      You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and
>
> •      You are unable to earn:
>
> >    •      during the Elimination Period and the next 6 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and
> >
> >    •      after such period, more than 60% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.
>
> . . . .

(Page ID 200.)

---

[2]Citations refer to pages of the Administrative Record in the CM/ECF Page ID# system.

Met Life initially approved Markey-Shanks's application for STD benefits commencing January 24, 2009, but subsequently discontinued STD benefits beyond May 8, 2009, due to a lack of medical proof supporting that Markey-Shanks was disabled.  (Page ID 141.)  Markey-Shanks appealed Met Life's decision, and Met Life referred the claim to an independent medical consultant, Dr. John W. Rodgers, board certified in internal medicine and pulmonary medicine, to review the file.  On September 14, 2009, after reviewing various progress notes and Attending Physician Statements from Markey-Shanks's treating physician, Dr. Sridhar P. Reddy, a board-certified pulmonologist, Dr. Rodgers concluded that the medical evidence did not establish a disability.  Dr. Rodgers stated that although Dr. Reddy's records showed that Markey-Shanks "has shortness of breath and has been treated appropriately with long acting and short acting bronchodilators,"[3] the records lacked any information documenting "airway obstruction severe enough to preclude sedentary levels of exertion in a clean air temperature controlled office setting."  (Page ID 609.)  In spite of Dr. Rodgers's conclusion, Met Life reinstated Markey-Shanks's STD benefits because her job required her to work on computers at employees' desks, exposed her to dust, and required her to lift up to 50 pounds.  (Page ID 71–72.)  On September 30, 2009, Met Life notified Markey-Shanks that her STD benefits were reinstated through July 24, 2009—the maximum duration for STD benefits under the Plan.  (Page ID 110.)  Met Life further advised Markey-Shanks that she should apply for Social Security Disability Income benefits.  (*Id.*)

On October 27, 2009, Met Life approved Markey-Shanks's application for LTD benefits effective July 25, 2009.  (Page ID 628.)  In its letter approving benefits, Met Life explained that it approved Markey-Shanks's claim because she was currently unable to perform the duties of her own occupation, but it noted that in order to be entitled to benefits beyond January 24, 2010, Markey-Shanks would have to be disabled from performing any occupation.  (Page ID 629.)  In addition,

---

[3] Markey-Shanks's asthma medications included Singulair, Albuterol, and Pulmicort.  (Page ID 153.)

3

Met Life advised Markey-Shanks that she would continue to receive benefits only if she remained totally disabled , and therefore would have to periodically provide medical evidence of her disability. (*Id.*) An internal claim note entered by a Met Life reviewer around the same time confirmed that the medical evidence supported the severity of a functional impairment precluding Markey-Shanks from returning to her own job, but indicated that it would be reasonable to evaluate Markey-Shanks for return to work once her condition stabilized. (Page ID 261.)

In November 2009, Met Life referred Markey-Shanks's claim to a vocational rehabilitation consultant, Robert C. Reall, MA, CRC, to identify sedentary jobs that Markey-Shanks was capable of performing given her education, training, and experience. After reviewing the file, Mr. Reall prepared an Employability Assessment and Labor Market Analysis identifying three sedentary jobs that Markey-Shanks was capable of performing, including Systems Analyst, User Support Analyst, and Computer Systems Hardware Analyst, all of which were available in the geographic areas in which she resided.[4] (Page ID 398–99.)

On December 14, 2009, Dr. Reddy sent a letter and updated office notes to Met Life regarding Markey-Shanks's condition. Dr. Reddy stated that Markey-Shanks had been diagnosed with severe asthma that required frequent treatments with systemic steroids to stabilize her condition. (Page ID 612.) Dr. Reddy further stated:

> Per my records, you do have documentation of her clinical condition as far as my progress notes go up until July 8, 2009. She subsequently was seen in our office on August 19, 2009. She had just received prednisone from her family care physician and continued to require a high amount of medication to keep her asthmatic symptoms under control. On September 30, 2009, she subsequently went to try for medical relocation to Arizona. She had to be restarted on prednisone and was seen again on November 23, 2009. At that time, spirometric evaluation was done which essentially showed a significant decrease in her peak flows. She was restarted on prednisone and tapered off over a one-week period. She was re-seen on November 30, 2009, and had some resolution of her symptoms, though not completely.

---

[4] Markey-Shanks resided in both Michigan and Arizona during the period of time that she received LTD benefits.

4

My impression on Michelle Markey-Shanks continues to remain severe asthma for which she is considered beyond a reasonable degree of doubt and with considerable medical certainty to be completely disabled from any work at this time.  She has frequent exacerbations and is requiring a high amount of medication including systemic steroids, leukotriene inhibitors, beta-2 agonists and high-dose aerosolized steroids to keep her symptomatology under control.  She has significant asthmatic triggers, including cold air, humidity, perfumes, deodorants, after shave, powders, scented candles, smell of cigarettes, different hair sprays, dust, mold, grass and trees, and talking causes her to go into coughing fits, to name a few.

From a medical perspective and my perspective, I would consider her completely disabled from any kind of work at this time.  She will continue over her lifetime to continue to check her peak flows and use asthmatic medications.  Because of the natural history of her disease and the severity of her disease, it is not unexpected that she will require courses of high-dose steroids along with her other medications in the future.

(Page ID 612–13.)  On December 21, 2009, after reviewing Dr. Reddy's letter and other information that Dr. Reddy provided, Dr. Rodgers amended his September 14, 2009 opinion to conclude that Markey-Shanks's frequent asthmatic attacks would have disabled Markey-Shanks from performing sedentary work though December 21, 2009.  (Page ID 597–98.)

In July 2010, Met Life requested from Dr. Reddy updated medical information concerning Markey-Shanks's functionality, restrictions, limitations, treatment plan, and return-to-work progress.  On August 23, 2010, Met Life received from Dr. Reddy an Attending Physician Statement and his office notes from a July 12, 2010 examination of Markey-Shanks.  Dr. Reddy's office notes stated that Markey-Shanks had one episode of shortness of breath, for which she had to use prednisone, but "otherwise has been doing well overall and spent time in Michigan and Arizona."  (Page ID 526.)  Met Life referred Markey-Shanks's claim file to Medical Consultants Network to review the file and opine on any functional limitations.  Dr. Leonard Sonne, a board-certified physician in pulmonary medicine, reviewed the file and issued a report on October 13, 2010, concluding that the medical information did not support any functional limitations beyond July 2010 that would preclude full-time employment.  (Page ID 556.)  In support of his conclusion, Dr. Sonne noted that

in various office visits, including her most recent one, Dr. Reddy had found Markey-Shanks's chest completely clear or there was some wheezing only on forced expiration. Dr. Sonne stated that the file lacked any information showing that Markey-Shanks had been admitted to a hospital for severe asthmatic incidents or had been admitted to an emergency room for asthma and that the results of a pulmonary functions studies done during one office visit did not preclude full-time work in her position. Dr. Sonne noted the absence of any documentation of tachycardia—a condition in which the heart beats faster than normal that patients with severe asthma often experience. Finally, Dr. Sonne noted that Markey-Shanks was able to travel back and forth periodically between Michigan and Arizona without any difficulty. (Page ID 557.) Met Life sent Dr. Sonne's report to Dr. Reddy for his comments. Dr. Reddy responded on October 28, 2010, stating that he disagreed with Dr. Sonne's findings because Markey-Shanks continued to have shortness of breath and continued to use systemic steroids, high-dose inhaled steroids, and leukotriene inhibitors, which rendered her unable to work. (Page ID 496.) Dr. Sonne reviewed Dr. Reddy's response and stated that it did not affect his prior conclusion because it did not "provide any objective documentation of any restriction, limitation, or impairment that would preclude full time work." (Page ID 489–90.)

On December 13, 2010, Met Life notified Markey-Shanks of its decision to terminate her benefits because she no longer met the requirements for disability under the Plan. (Page ID 527.) In its letter, Met Life noted that Markey-Shanks had been out of work due to her asthma. Met Life further noted that Dr. Reddy's most recent office notes indicated that Markey-Shanks had only one episode of shortness of breath and had to use a prednisone taper, but otherwise was doing well overall, and that on physical examination her vital signs were stable, her chest was clear, and her cardiovascular system revealed a normal heartbeat. (Page ID 528.) Met Life also advised Markey-Shanks that it had sent her claim to an Independent Physician Consultant (IPC) for review and the IPC's (Dr. Sonne's) October 13, 2010 report concluded that the medical information in the claim

file did not support any functional limitations beyond July 2010 precluding Markey-Shanks from working full-time at any position.  Met Life further explained that the IPC's conclusions relied on unremarkable findings from physical exams, the lack of evidence of tachycardia, the lack of hospitalizations or emergency room admissions for asthma, and the absence of records substantiating pulmonary restriction.  (*Id.*)  Finally, Met Life identified three jobs in the local economy that Markey-Shanks could perform and concluded:

> In summary, although you and your health care provider indicate you are unable to work at any occupation due to your asthma, the medical and vocational information available for review, [sic] no longer supports you meet [sic] the requirements of your employer's plan.  The medical information provided for review does not substantiate your inability to perform any occupation and earn a gainful wage as supported by the employability and labor market analysis outlined above.  For these reasons, your claim is terminated effective the date of this notification.

(Page ID 531.)  Met Life also advised Markey-Shanks of her right to appeal the determination.

Markey-Shanks appealed the initial determination on April 27, 2011.  In her written appeal, Markey-Shanks advised that, apart from her asthma, she suffers from several other conditions, including tachycardia; bradycardia (a slower-than-normal heart rate); Rosaca, a chronic, inflammatory skin condition; and sleep apnea.  (Page ID 523–24.)  Met Life referred the claim for review to Dr. John W. Rodgers, who had previously reviewed Markey-Shanks's claim, and to Dr. Richard B. Evans, board certified in internal medicine, pulmonary medicine, critical care medicine, and occupational medicine.  In his report issued May 27, 2011, Dr. Rodgers observed that although Dr. Reddy's notes indicated that Markey-Shanks had episodes of coughs and wheezing, there was no documentation of formal pulmonary function tests.  (Page ID 424.)  Dr. Rodgers also indicated that (1) there was no evidence that Markey-Shanks's tachycardia could not be controlled with medications or that her symptoms limited sedentary activities; (2) there was no documentation that her sleep apnea caused an impairment; (3) there was no evidence that her medications caused side effects that resulted in functional restrictions; (4) Markey-Shanks was using asthma medications

only for episodes of asthma rather than chronically; and (5) there was no indication that she could not "manage activities of daily living, walk, sit[,] stand for 8 hours intermittently, bend, stoop, twist, reach above and below shoulder height, use a keyboard, lift up to 20 lbs. intermittently." (*Id.*)  Dr. Rodgers concluded that, with the exception of needing to work in a clean air, humidity- and temperature-controlled environment, Markey-Shanks had no functional limitations precluding her from performing sedentary work.

In his report, issued June 6, 2011, Dr. Evans indicated that although Dr. Reddy had characterized Markey-Shanks's asthma as "severe," the file lacked objective data or pulmonary function tests supporting this conclusion.  Like Dr. Sonne, Dr. Evans noted the absence of documents showing that Markey-Shanks had been hospitalized for asthma.  Dr. Evans did indicate that Dr. Reddy had "one pulmonary function test which showed a post bronchodilator FEV1 of 2.05 liters, 76% of predicted, and a 33% improvement in FEV1 following bronchodilators," but Markey-Shanks's asthma would only be characterized as  "moderate" under the American Thoracic Society Guidelines for the Evaluation of Impairment/Disability in Asthma.  (Page ID 409.)  Dr. Evans concluded that Markey-Shanks had asthma of moderate severity, which would preclude her "from working in extremely heavy work; extremes of temperature or humidity and from work with exposure to fumes, such as working in a chemical factory," but her asthma did not preclude her from office-based work.  (*Id.*)  Met Life sent Dr. Rodgers' and Dr. Evans' reports to Dr. Reddy for his comment, but Dr. Reddy did not respond.  (Page ID 389.)

On June 29, 2011, Met Life informed Markey-Shanks of its decision to uphold the original determination that she was no longer disabled.  Met Life explained that her claim had been reviewed by an IPC (Dr. Evans), who indicated that Markey-Shanks's had asthma of moderate severity but was able to perform sedentary work in a clean environment.  (*Id.*)  As for the other impairments Markey-Shanks identified in her appeal letter, Met Life noted that the IPC had indicated that there

8

was no evidence that such conditions could not be effectively controlled through medication or that they would prevent her from performing sedentary work.  Finally, Met Life advised Markey-Shanks that she had exhausted her administrative remedies under the Plan for her claim based on her asthma and tachycardia.  (Page ID 391.)  Thereafter, Markey-Shanks filed the instant case seeking review of Met Life's termination of benefits.

## II. DISCUSSION

### A.    Standard of Review

The default standard of review in a claim seeking review of denial of benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), is de novo.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989).  On the other hand, a court employs a deferential standard of review if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Id.* at 115, 109 S. Ct. at 956–57; *see also Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009) ("When the plan gives the administrator discretionary authority, we apply the highly deferential arbitrary and capricious standard.").

The Plan contains the following provision regarding Met Life's discretionary authority:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.  Any interpretation or determination made pursuant to such discretionary authority shall be given force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Page ID 233.)  This language provides a sufficiently clear and express grant of discretionary authority to Met Life to warrant application of the deferential standard of review.

Markey-Shanks concedes that the discretionary clause warrants application of the deferential standard of review, (Pl.'s Br. Supp. Mot. at 11), but she contends that Met Life should be precluded

9

from arguing for application of that standard . Her argument revolves around the adoption of Rules 500.2201 and 500.2202 of the Michigan Administrative Code.  Rule 500.2202 prohibits the inclusion of a "discretionary clause" in "a policy, contract, rider, indorsement, certificate, or similar contract" as of June 1, 2007.  Mich. Admin. Code Rule 500.2202(b).  The prohibition applies to insurance policies and related documents issued before June 1, 2007 only if the document was revised after June 1, 2007.  *Id.*  The Sixth Circuit has held that Rule 500.2202(b) falls within ERISA's savings clause and is thus not preempted by ERISA's express preemption clause, ERISA § 514(b)(2)(A), 29 U.S.C. § 1144(a).  *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604–07 (6th Cir. 2009).  Markey-Shanks admits that Rule 500.2202 does not apply to the Policy because Met Life issued it before June 1, 2007, and did not amend it after that date.  (*Id.* at 11–12.)  Nonetheless, she contends that Met Life is precluded from enforcing the discretionary clause because Met Life certified to the Commissioner of Michigan's Office of Financial and Insurance Services (OFIS) that Met Life had removed discretionary authority language from certain group long-term care and long-term disability policies and, after March 1, 2007, would not advertise or sell any policy in Michigan containing "discretionary authority language disapproved in the December 21, 2006, Notice of Disapproval." (*Id.* Ex. 2, Page ID 822. ) Markey-Shanks notes that Met Life made this representation in response to the Commissioner's notice that she would seek to decertify policy forms issued prior to June 1, 2007 that contained discretionary clauses.

Markey-Shanks does not identify a legal basis for precluding Met Life from enforcing the discretionary clause, although she appears to rely on some form of estoppel.  Whatever its basis, her argument fails because apart from its certification, Met Life advised the Commissioner that "for plans governed by [ERISA] in which Met Life provides insurance to fund the plans, Met Life will continue to be guided by the terms of the summary plan description ("SPD") that employers as plan administrators are required to create and distribute to their plan participants." (*Id.* Ex. 2, Page ID

10

823.)  Met Life further advised the Commissioner that SPDs are regulated by the United States Department of Labor rather than state insurance regulators.  (*Id.*)  Met Life thus did not mislead the Commissioner or misrepresent its intention to continue applying discretionary clauses when they are contained in documents regulated by ERISA rather than state insurance laws.  In the instant case, the discretionary clause is contained not in the Policy, but in the ERISA plan document itself, which is not subject to regulation by the Commissioner.  In this regard, the administrative rules that Markey-Shanks cites apply only to insurance policies and other documents subject to approval by the Commissioner.  A "'[d]iscretionary clause' is a provision in a form that purports to bind the claimant or to grant deference in subsequent proceedings to the insurer's decision . . . ."  Mich. Admin. Code Rule 500.2201(c).  A "form" is "a form identified in MCL 500.2236(1)."  Mich. Admin. Code Rule 500.2201(d).  Section 500.2236(1), in turn, provides that an insurer may not issue an insurance policy, application form, rider, indorsement, renewal certificate, or group certificate in Michigan until the Commissioner approves the form.  An ERISA Plan or SPD is not among the documents subject to approval by the Commissioner.  *See Am. Council of Life Insurers*, 558 F.3d at 605 (noting that "under the plain language of the rules, any insurer who wishes to provide insurance in Michigan must submit its insurance forms to the Commissioner for review and may not include a discretionary clause in such forms").  The plain language of Rules 500.2201 and 500.2202 thus makes clear that they do not apply to ERISA SPDs and other plan documents subject to federal regulation.  *See* 29 C.F.R. § 2520.102-3 (specifying information that must be included in an SPD).  Moreover, the documents Markey-Shanks submits show that in its communications with Met Life and other insurers, OFIS was concerned only with discretionary clauses contained in insurance policies and  other insurance-related documents subject to the Commissioner's approval.[5]

---

[5] The Court acknowledges that the Policy is properly considered part of the ERISA Plan documents.  *See Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*, 644 F.3d 427, 433 (D.C. Cir. 2011) (noting that "ERISA's statutory text suggest that multiple plan documents can be legally relevant" and that "the ERISA sections on fiduciary

Accordingly, the Court must apply the arbitrary and capricious standard in reviewing Met Life's decision.

The arbitrary and capricious standard "'is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (citation omitted) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)); *see also Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991) (noting that administrators' decisions "are not arbitrary and capricious if they are 'rational in light of the plan's provisions'") (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)). Although the standard is highly deferential, it still requires "some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). Thus, a court must do more than merely rubber stamp the administrator's decision. *Id.* The decision must be upheld, however, "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010) (internal quotation marks omitted).

**B.      Conflict of Interest**

In applying the arbitrary and capricious standard, a court must consider and evaluate potential conflicts of interest that may affect the plan administrator's decision. *See Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd* 554 U.S. 105, 128 S. Ct. 2343 (2008). A potential conflict of interest exists where, as here, the plan administrator reviews and pays claims. *See id.*

---

responsibilities imply that there will be multiple legally important plan documents"). However, the Michigan Rules pertain only to insurance documents subject to approval by the Commissioner. Whether the State of Michigan may specifically prohibit insurers from including discretionary clauses in ERISA SPDs they furnish to employers in connection with the sale of group insurance policies is a question this Court need not consider.

A conflict of interest does not change the standard of review, but is simply one consideration a court weighs in applying the arbitrary and capricious standard. *Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006). A conflict of interest carries more than only some weight, however, when there is "significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present." *Id.* For example, a court may accord a conflict of interest greater weight were there is evidence that "an insurance company administrator has a history of biased claims administration." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117, 128 S. Ct. 2343, 2351 (2008). In a recent decision, the Sixth Circuit observed that following the Supreme Court's decision in *Glenn*, the Sixth Circuit "has given greater weight to the conflict-of-interest factor when the claimant 'offers more than conclusory allegations of bias.'" *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 664 (6th Cir. 2013) (quoting *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009)).

Although Markey-Shanks raises Met Life's conflict of interest as a factor the Court should consider, she fails to cite any particular evidence suggesting that bias influenced Met Life's determination in any manner. Accordingly, while the Court considers Met Life's conflict of interest, it finds no reason to accord that factor significant weight. *See id.* (concluding that the plaintiff's mere reliance on "the general observation that Met-Life had a financial incentive to deny the claim" provided no basis for giving more weight to the conflict-of-interest factor).

## C.    Met Life's Decision

In reviewing a plan administrator's denial of benefits, "the ultimate issue . . . [for the court] is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). The information Met Life reviewed included the opinion of Dr. Reddy, Markey-Shanks's treating pulmonologist, who concluded that Markey-

Shanks was totally disabled from even sedentary work, and the opposing opinions of three similarly-qualified IPCs, Drs. Rodgers, Sonne, and Evans, who opined that although Markey-Shanks had moderate asthma and required a clean air, humidity- and temperature-controlled environment, she was not disabled from performing sedentary office work. In its final determination, Met Life relied on Dr. Evans's opinion, noting:

> The consultant noted that he spoke with Dr. Reddy, who stated that he felt that you were disabled from work, predominantly based on your extensive medication use and that he felt that you were frequently being treated by your family physician for asthma exacerbations. The consultant discussed with Dr. Reddy that there was little in the way of objective findings of asthma impairment in the file. Dr. Reddy stated that he was predominantly treating you without pulmonary tests when his clinical impression was asthma exacerbation. The consultant stated that Dr. Reddy did have one pulmonary function test which showed a post bronchodilator FEV1 of 2.05 liters, 76% of predicted, and a 33% improvement in FEV1 following bronchodilators.
>
> After a complete review of all information provided, the consultant noted in regards to your asthma, there was no documentation provided of any hospitalizations, emergency room visits or urgent physician visits for your asthma. You did require treatment with daily inhaled steroids and occasional courses of oral steroids. . . . The consultant concluded that based on objective findings available, and from the phone conversation with Dr. Reddy, you have moderate asthma and were capable of sedentary work in a clean environment. The consultant indicated that the information did support asthma of moderate severity, and that this would preclude you from working in extremely heavy work; extremes of temperature or humidity and from work with exposure to fumes. The consultant indicated that moderate asthma did not prevent you from office based work. . . . The consultant noted that there was no clinical evidence to support restrictions and limitations or side effects from the medications that you were taking from December 10, 2010 forward. In summary, based on your moderate asthma, you were capable of sedentary work in a clean environment.

(Page ID 388–89.)[6]

Markey-Shanks cites no basis to question the validity or soundness of Dr. Evans's opinion, such as incorrect or insufficient information, unfounded assumptions, or conclusory analysis.

---

[6] Met Life also noted that Dr. Evans addressed Markey-Shanks's other conditions, including sleep apnea and tachycardia and concluded that those conditions would not limit Markey-Shanks from performing sedentary work. (Page ID 388–89.) Markey-Shanks does not dispute these findings in this case.

However, she offers several grounds for concluding that Met Life's decision was arbitrary and capricious.

First, Markey-Shanks argues that Met Life acted arbitrarily and capriciously by not exercising its contractual right to have her submit to an independent medical exam and, instead, retaining three physicians to conduct file reviews. She further contends that the Sixth Circuit disfavors a plan administrator's reliance on a medical opinion generated by a "cold" file review, as opposed to the opinion of the treating physician who actually examined the claimant. Markey-Shanks is correct that, in a number of cases, the Sixth Circuit has criticized the decisions of plan administrators to opt for file reviews in lieu of physical examinations. *See, e.g.*, *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006); *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 509 (6th Cir. 2005); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2008). At the same time, the court has observed that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert*, 409 F.3d at 296. Whether a plan administrator acted improperly by relying on a file review instead of exercising its right to conduct a physical examination thus depends on the particular circumstances of the case. *See id.* at 295 (noting that "the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination"). The circumstances in this case do not render Met Life's reliance on a file review objectionable. The Sixth Circuit has frowned on file reviews only where the reviewer makes a credibility determination or the plan administrator unreasonably credits the file reviewer's opinion over that of the treating physician. *See Judge*, 710 F.3d at 663. Neither situation is present here. Dr. Evans merely reviewed the medical records and determined that there were no clinical findings or objective data indicating more than moderately severe asthma, without opining on Markey-Shanks's credibility. Moreover, Met Life articulated its

reasons for crediting Dr. Evans's opinion over that of Dr. Reddy, namely, that his opinion of severe asthma was not supported by objective evidence. *See Curry v. Eaton Corp.*, 400 F. App'x 51, 60 (6th Cir. 2010) (stating that while a plan administrator may not simply choose to ignore a treating physician's opinions, "it can resolve conflicts between those opinions and the opinions of its own file reviewers if it provides reasons—including a lack of objective evidence—for adopting the alternative opinions that are consistent with its responsibility to provide a full and fair review"). Given the conflicting opinions, Met Life was thus entitled to credit Dr. Evans's opinion that Markey-Shanks's asthma did not preclude her from performing sedentary work in a clean air, temperature- and humidity-controlled office environment. *See McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003).

Markey-Shanks next argues that Met Life failed to adequately consider the effect of the powerful and high-dose medications that she must take on her ability to work. Markey-Shanks cites *Smith v. Continental Casualty Co.*, 450 F.3d 253 (6th Cir. 2006), in which the Sixth Circuit held that the defendant's denial of benefits was arbitrary and capricious because the defendant failed to adequately consider the effect the number and nature of medications the claimant was taking had on her ability to work. *Smith* is distinguishable for two reasons. First, unlike the defendant's reviewing physician in *Smith*, Dr. Evans actually commented on the effects of the medications Markey-Shanks was taking, noting that "[t]here is no clinical evidence to support restrictions and limitations or side effects from medications taken from 12/10/10 to the present." (Page ID 410.) Second, the claimant's medications in *Smith* included Oxycontin and other narcotic pain relievers, which could be expected to impair one's ability to work. *See id.* at 264. There is no evidence that Markey-Shanks is on narcotic pain relievers and, as Dr. Evans observed, there is no indication in the record that the medications Markey-Shanks was taking would produce disabling effects similar to those of narcotic pain medication.

16

Markey-Shanks also contends that Met Life is estopped from taking a position contrary to that of the Social Security Administration (SSA), which found Markey-Shanks disabled under the Social Security Act, because Met Life required Markey-Shanks to file for Social Security Disability benefits and reaped a benefit from the award by recovering overpayments from Markey-Shanks pursuant to the Policy's offset provision.  This argument fails because the SSA issued its award more than seven months after Met Life issued its final determination.[7]  The Sixth Circuit has held that

> if the plan administrator (1) encourages the applicant to apply for Social Security disability benefits; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on a question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious.

*Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008) (citing *Glenn*, 461 F.3d at 669).  The court's rationale cannot be that the mere existence of a Social Security award renders a plan administrator's denial of benefits arbitrary and capricious, because *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965 (2003), forecloses such a result.  Rather, a plan administrator's *failure to explain* a decision contrary to a SSA decision may be indicative of an arbitrary and capricious determination.  *Bennett*, 514 F.3d at 553 n.2 (stating that "mere mention of the decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA").  In this regard, Markey-Shanks's argument runs into two insurmountable obstacles.  First, because this Court's review is confined to the documents the plan administrator had before it when it made its decision, *see Wilkins*, 150 F.3d at 615, the Court cannot consider the SSA's award.  Second, even if the Court could consider the award, it provides no basis

---

[7] The Court relies on Defendants' representation in their response brief as to when the SSA issued its award, because the award is part of the Administrative Record and no other document indicates when the award was issued. Markey-Shanks does not dispute Defendants' representation, and even concedes that the SAA issued the award after Met Life made its final determination.  (Pl.'s Reply Br. at 4.)

to assess whether Met Life acted arbitrarily and capriciously because Met Life had nothing to explain when it issued its decision.

Next, Markey-Shanks argues that Met Life's denial of benefits was unreasonable because, in conducting its vocational analysis, Met Life failed to fully consider whether the sedentary jobs that Met Life identified were jobs that Markey-Shanks could perform in light of her functional limitations, specifically, the broad range of environmental triggers of her asthma attacks.  Markey-Shanks further notes that a Met Life claims specialist noted that "ee [Markey-Shanks] needs a work environment totally free of dust or any other air contaminents [sic] and it is very doubtful that such an office exists." (Page ID 277.)  Citing *Rabuck v. Hartford Life and Accident Insurance Co.*, 522 F. Supp. 2d 844 (W.D. Mich. 2007), Markey-Shanks contends that Met Life's vocational analysis was deficient.  In *Rabuck*, Magistrate Judge Scoville found that the administrator's vocational determination was arbitrary and capricious because the administrator's vocational analysis failed to consider the non-strength requirements of the plaintiff's job and how the plaintiff's short-term memory deficit affected his ability to perform those job duties.  *See id.* at 876–77.

*Rabuck* is distinguishable from the instant case because the evidence in this case shows that Met Life considered all of Markey-Shanks's functional limitations, by including a clean air temperature controlled office setting in her restrictions.  (Page ID 398.)  Given that Dr. Evans concluded that the objective evidence supported only moderately severe asthma precluding Markey-Shanks from performing extremely heavy work or working in temperature extremes or exposed to fumes, such as in a chemical refinery, the requirement of a clean air environment specifically addressed her limitations.  To the extent that Markey-Shanks suggests that Met Life somehow bound by its internal notation that a totally dust- and contaminant-free office environment likely does not exist, Markey-Shanks fails to cite any authority for such a proposition.  In any event, while it is

probably true that such an environment does not exist (anywhere in the world), there is no indication in the record that a person with moderately-severe asthma requires such a sterile environment.

Finally, Markey-Shanks argues that Met Life's decision must be reversed because Met Life failed to show the requisite change between October 2009, when it approved Markey-Shanks's application for LTD benefits, and late 2010, when it terminated her benefits.  Markey-Shanks notes that in an October 21, 2009 file note, Met Life noted that it may be reasonable to evaluate Markey-Shanks for return to work later, when her condition "stabilized."  She further notes that even if her condition "stabilized," Met Life has not shown that her condition improved in any respect that would support a finding that she was not disabled.  Met Life responds that Markey-Shanks's argument fails to consider that the Plan's definition of "disability" changed effective January 24, 2010, from "own occupation" to "any occupation" and that under the new definition, Markey-Shanks had the burden of showing that she was disabled from any occupation taking into account her training, education and experience.

The record shows that Met Life approved Markey-Shanks's application for LTD benefits in October 2009 because she was unable to perform the duties of her Senior Desktop Analyst position, which exposed her to dusty conditions.  Although the Policy's definition of "disability" changed on January 24, 2010 from "own occupation" to "any occupation," it did not review her eligibility for benefits under the changed definition until the summer or fall of 2010.  Met Life's conclusion in 2010 that Markey-Shanks was not disabled was thus not unreasonable, even if Markey-Shanks's condition had not improved, because Met-Life's determination that Markey-Shanks was disabled under the Policy's "own occupation" definition was not determinative of whether she was disabled under the Policy's stricter "any occupation" definition.  *See Martindale v. Lincoln Nat'l Life Ins. Co.*, No. 10-15173, 2011 WL 3957607, at *10 (E.D. Mich. Sept. 8, 2011).

19

### III. CONCLUSION

Having reviewed Met Life's decision in light of the administrative record, the Court concludes that Met Life made a reasoned decision based on substantial evidence, did not arbitrarily reject the opinions of Markey-Shanks's treating physician, and reasonably resolved conflicts among competing medical opinion. *See Glenn*, 461 F.3d at 666. Accordingly, Met Life's decision was not arbitrary and capricious, and the Court will grant Met Life's motion and affirm its decision.

An Order consistent with this Opinion will be entered.


Dated:  July 23, 2013                                                    /s/ Gordon J. Quist
                                                                      GORDON J. QUIST
                                                           UNITED STATES DISTRICT JUDGE